Call the next case. 109-1760 ADT Security Systems v. Mutual Counsel, please. May it please the Court. Mr. Caper. Did you plan it dramatically, didn't you? I'm Michael Schneider, and I'm representing the appellant ADT Security Services. As a counselor, as well as a litigator, as a client counselor, I should say, you rarely, if ever, see me here arguing that commission decisions are against the manifest weight. So I am not here today to ask you to reweigh the evidence. I am, however, asking you to find that no rational trier of fact could agree with the agency in this instance, and I'm referring, first off, to the finding on average weekly wage. Mr. Musial was unemployed when he attended an ADT job fair for salespeople in 1998. His last job was selling dental practice software, and in essence, software was what he had primarily sold his whole life, whether it was law software or retirement community software or dental software. That's essentially what he did, on and off. And in the appendix, you'll see his employment application that lists all that employment history. After several meetings with a company representative named Newell, who's no longer with the company, Musial testified that in the second or third meeting, this would have taken place in February of 2008, he claimed he was promised a job in ADT's core division, where per Newell, according to Mr. Musial, no one made less than $50,000 a year. Newell was the manager of the core division, right? Correct. For that area. Yes. Now, in court... So that would be the person you'd expect to be negotiating with if you were getting a job in the core division. Well, there's testimony from Otto Tones and from John Roberts that Newell split this job with another fellow whose name escapes me. The other fellow was new, and so he would tobble back and forth in terms of hiring people for core and in hiring people for the high sales department. That is in the record. So Newell served a multitude of purposes. I was about to say important to understand is there's really three types of jobs at ADC security for sales. There's the entry-level jobs, which are really residential, and a little half-step up from there, but still considered entry-level, is these mom-and-pop, which we call high-volume sales. You go to strip malls, it's cold-calling. The second division is what you're referring to, Your Honor, and that's the core division, where people already have to have a pretty wide range of experience in ADT's products, because you're selling to department stores or maybe not national banks, but more sophisticated, expensive, elaborate security systems. And then the third, which really isn't in question, is when you're a honcho and you're working national accounts. Maybe you're doing security for Target all over the country. Now, I don't want us to get hung up on this $50,000 thing, because that's not really where all the evidence points. Despite what Mr. Museum Maintain Newell represented to him in February of 2008, when he came in to sign his employment agreement two months later in April, he signed and was hired for the high-volume, that is, that mom-and-pop division. I don't make this declaration that he was hired for high-volume sales based on a conflicting testimony and ask that you resolve a conflict in favor of ADT. I make this statement because Mr. Newell agrees it is true, and due to the employment agreement admitted into evidence. That employment agreement, we include it in the appendix. You'll find it at A111. And it's clear, I believe beyond refute, to anyone that looks at it, that that's precisely what he agreed to undertake. Page A11 and A112. He signs it April 24. It says clearly, ADT is pleased to offer you the position of sales representative. Start date, pending drug approval. Job grade, begin as high-volume sales rep. And then it shows this declining commission, this draw. By the end of three months, you're on straight commission. If you go further down on the document, it says transfer. Yes, you can be transferred, assuming that you're doing a good job and you have experience in security sales, to this core sales representative. Where there, you do enjoy a $17,000 base salary plus commissions. Well, you're giving us a lot of background, but isn't this a question of fact to be determined by the commission? Yes, it is. So there's conflicting evidence on the wage differential, correct? Not on wage differential. I thought I heard you say wage differential. What is the conflicting evidence on that? There is no conflicting evidence as far as I'm concerned. He was hired for high-volume. I mean, I am saying to you that this is a totally illogical decision. Employment contract, hired for high-volume sales. That's the entry level. Then, as you go further, if that weren't enough, we have Mr. Musial, as I said before, his concurrence. It's quoted in my brief when he said he started in May of 1998 as a high-volume sales rep. And here's what I mean when I say, Judge, there's no conflict. I'm asking him about this produced sales agreement. Are you familiar with the letter that your family member gave us? Yes? It says your guarantee was declining each month in $500 increments, right? From $1,500 to $1,000, third month you're down to $500. And he says, I totally get it. Question. So that's the type of sales structure that goes along with the job in small business, does it not? That is correct. And then I ask, you said that the core sales representative in your mind had an absolute rock bottom of a $17,000 guarantee, whether he sold anything or not. He says, well, he had guaranteed salary. Okay. So if this document is telling you you have a declining draw, how does that square with your understanding of core sales representative's job? And he says, well, that was a big surprise to me. But I question him, well, but this is dated before you started work. And indeed it is. It's dated April 24, and he gets hurt on his first day of work in May. He says, I understand that. That was dated before I started work pending my drug test. Okay. He says, he made the offer to me on the core plan, but when I walked into, and then I interrupt him and said, but that's what you characterized as the oral offer in February. And he says, yes. And then when I came in to actually take care of the paperwork, Your Honor, I was told at that point that there was a small glitch, that he's going out of town, that I'm going to have to start with this route for just a little, for just a time being until they get somebody to start training me in the core sales rep. But Mr. Musial, you are aware of the salary structure. You're aware what the salary structure was when you received this letter on April 24. It didn't come as any surprise to you on May 11, true? Well, when you've turned down jobs or you consider looking for a job, I figured, why not go with it? That's why I say, the worst you can accuse my client of, and Newell's nowhere to be found, the very worst. If you want to take Mr. Musial at his word, you know, he's the most honest person in the world, then the worst you can say about my client is in February during these oral conversations, again, assuming Mr. Musial heard it correctly and wasn't hearing what he wanted to hear, the worst you can say is that Newell did a bait and switch. But I don't think that's a reason to give him a $57,500 a year annualized average weekly wage when it's clear from the contract and from Mr. Musial's agreement that when he was finally hired, and this was the last act that hired him, if it was a jurisdictional case, we would be looking at this contract, not at things that preceded it. This is why he was hired in high volume mom and pop. And I don't believe there's any dispute, Your Honors, to that anywhere in the record. Rather than spending all of your time on that, do you have anything to add on the other part of the appeal where you were questioning whether his physicians gave improper or inadequate care or injurious practices? Anything you can summarize on that? I, unfortunately, like the other attorney, am a little bit deaf. Will you ask me about the second issue about medical? Yes. Rather than spending all of your time on the wage differential, what about the second issue? You allege that the claimants treating physicians were providing improper or inadequate care and were engaging in injurious practices. Yes. And then I'll, yes, I can. Summarize your argument on that. All right. I feel this is a little more difficult of the two arguments. And it's primarily because I don't think the commission, and I don't think any of us, are really comfortable in interposing judgment on what physicians say. I've always adhered to a philosophy that if you have a doctor that says, I want to do surgery, and you have a willing patient that's willing to lie down, if some other doctor says, no, he doesn't need the surgery, the commission isn't going to play God and they're going to go along with the doctor and the patient, which I think is understandable. But what you have here is something far different. The only doctor that's treating Mr. Musial is a psychiatrist. Why she is serving a dual role and also prescribing him ungodly amounts of morphine is inexplicable. That's not what psychiatrists are there for. When you go into the record. Well, he was being treated by a pain management specialist. Not since 2002. And isn't the testimony in the record that that's because you quit paying, because the employer quit paying for him? The things that she wanted to do after 2002, he didn't want. He didn't want the spinal cord stimulator. And even at trial, he didn't want the morphine. Excuse me, didn't Dr. Curran testify that you cut off payment? That we stopped paying for those things? That she would still recommend the same treatment as before? She was ultimately moving towards the morphine pump. We took two depositions in 2002 because the petitioner supposedly wanted those things. We took her deposition and we took the deposition of the psychiatrist. Between 2002 until the point in time, Your Honor, when I, as Respondent's Counsel, eventually dragged this case before the commission. The petitioner didn't. They didn't come in on a prospective payday to ask for the morphine pump. It became clear, as an ancillary matter at trial, that Mr. Musial didn't want the spinal cord stimulator. And by that point in time, the doctors had ruled it out. And he did not want the morphine pump. So, in essence, whatever the doctor was still proposing from 2002 was really off the table. Because if it had been on the table, then the petitioner's attorney, logically, after those 2002 depositions, would have moved forward. I don't recall off the top of my head when the hearing was, which we convened, but it was easily three years later, if not more. So I really do think that's a rather moot issue. What I think is important to your determination on this issue is a consideration of how, what do we do? How do we abide by someone being turned into and created into like a morphine drug addict under the auspices of a psychiatrist writing for pain medication? Now, the only support for that position that you just stated is your third independent medical examiner, right? The first two that the employer hired agreed with the treatment that was being given by the treating physician. If you're referring to Dr. Lubinov of the Russian Pain Center, that is also back in 2005. He couldn't have possibly been agreeing with the treatment that's been rendered since then that was brought to arbitration because, as I said in my brief, when we deposed Dr. Curran, she said, this was in May of 2000, not 2002, actually. No, in May of 2000, that wasn't the deposition. In May of 2000, when we took the deposition, Curran said, Mr. Musial is on 540 milligrams of cadian, which is this morphine. She said, I'm not writing it for it. The psychiatrist, Dr. Dobrolovsky, who referred the patient to me, she's the one that writes it. Then, in 2002, this is around the time of the deposition, she says, he's up to 1,200 milligrams. This is Dr. Dobrolovsky. Curran already said, I'm the pain doctor, and when I administer cadian, the dosage ranges between 400 and 600. So now we go out and take Dobrolovsky. Dobrolovsky says he's on 1,200, and that's in October of 2002, twice the maximum amount that Curran would have ever written. But the reality is, and scarily so, I'm afraid, Dr. Dobrolovsky is wrong, and she's the one writing the prescription. Counsel, your time is up. You'll have time on rebuttal. Thank you. Let me remove some of my documents. Thank you. Good morning, Your Honors. Counsel. My name is Daniel Capron on behalf of the petitioner, William Musil, in this case. When Mr. Schneider first got up before you, he said that he didn't believe that there was any conflict in the evidence on the issue of average weekly wage. And I would respectfully disagree with that. At page 111 of the arbitration transcript, Mr. Musil was asked the following question. Now, when you were hired by ADT, were you hired for the small business division with a promise that they would try to transfer you to the core division at some future point in time? Answer, no. Or were you hired for the core division and assigned to the small business division for training? Answer, the second. Steve Newell, who interviewed and hired Mr. Musil, was the core division manager. The arbitrator found this to be an important point. The arbitrator also found that it was significant that a man with 20 years of sales experience would be hired not for the entry-level small business division but for the more experienced core division. Now, Mr. Schneider is quick to point out, yeah, well, he didn't know anything about security systems. Except that in the record, the petitioner himself testified that of the 15 to 20 people who were employed in the core division, not all of them came to the company with experience in security systems. What was essential was sales experience. And that's what Mr. Musil had. So his testimony, as I just quoted to you, is entirely consistent throughout. The evidence is conflicting. I'll be the first one to admit it. You could read the contract that was signed by both parties and you could conclude, well, this does say small business division, although there is a reference to core division. There's a reference to being paid under the core division plan. Who controlled all that evidence? The respondent controlled it. They drafted that document. They are responsible for the fact that those documents are vague and conflicting. My client comes in, gets hired, gets hurt on his second day at work. So what does he know about what people in the core division make? He doesn't know anything other than what he was told. And that's what he testified to. Now, their documents and their data, although they did not produce core division figures at arbitration, I believe that my opponent conceded in his brief that the $50,000 to $100,000 a year figure was accurate for a core division employee. So the only real question that we're fighting over here is whether Mr. Musial was a core division employee and that's where we look for the comparable wages or small business division. The evidence on that point is conflicting and, Your Honor, this is precisely the type of factual dispute that the Commission is empowered to decide. The original arbitration decision was not cavalierly entered into. It's a 22-page decision. It's extremely thorough. It's comprehensive. It's detailed. It highlights the evidence on both sides of these questions. Did the arbitrator do that or did one of you get turned in? The arbitrator did that. And that decision was then adopted by the Commission. They affirmed and adopted. So the words are the arbitrator's words that then became the Commission's decision. So this isn't some kind of a case that was just decided upon willy-nilly. This is precisely what you would want the Commission to do and the arbitrators to do is to weigh these factual questions. Now, the medical issue on this case is sadly tragic. And I would start out by saying that I believe what my opponent is making is a Section 19D argument, which I believe is subject to the abuse of discretion standard. I don't think it's manifest weight. In order for him to prevail, he has to show that the Commission's decision represented an abuse of discretion. When you have four physicians on one side of a medical question, including the respondent's first examiner in the field of pain management, and juxtaposed against that only a subsequent examiner, I don't see how you could say that the Commission's failure to adopt that subsequent examiner's opinion was an abuse of discretion. Mr. Snyder, the one thing I do agree with what he said is these are inherently personal decisions between a patient and his physicians. And the Commission should be loathe to intervene in that relationship. We've got a condition that all of the doctors have suggested is incurable. There's no cure for RSD, chronic regional pain syndrome. So all they're trying to do is to treat and address the symptoms. Mr. Musial's morphine levels are unquestionably high. But I would point out that the reason why we are where we are today, sadly, is because the respondent, ADT, did not authorize the treatment at the time it was prescribed. Yes, when we got to arbitration, Mr. Musial pointed out that he was no longer interested in the spinal cord stimulator unit. He did say, however, that he would consider. He wasn't sure about the morphine pump. But he didn't want the spinal cord stimulator unit. That was 2005. At the time those treatments were prescribed back in 2000 and 2001, when there was unanimity of medical opinion that this was what was needed, Mr. Musial wanted that treatment, and the respondent wouldn't authorize it. We have four doctors saying that he needed a spinal cord stimulator unit. They wouldn't authorize it, and that's when they decided to go to their medical bullpen and send him to Dr. Blonsky. And now we're off to the races and now we've got a guy whose morphine levels are immensely higher than what they otherwise would have been. It's sad. We can't go back and replay this golf shot. We're stuck with where we are right now. But I don't believe that we are dealing with a reversible issue here for the Commission merely to have adopted the opinions of those treating doctors and ADT's initial examiner. Thank you. Thank you, counsel. Rebuttal? Counsel misconstrues what I want this Court to do in terms of medical care, and I'll be brief on this section of the rebuttal. Historically, what transpired, whether it was two doctors or three doctors back in 2002 or 2000, is not where we were in 2005. Where we were in 2005 is with Dr. Dobrolowski unknowingly prescribing 1,800 milligrams a day of morphine, although she in her testimony thinks she's ordering 1,200, which is already an ungodly amount. You know from our brief it isn't as if we were here to cut this man off at his legs. We were suggesting that he go through some you can't live on 1,800 milligrams of morphine a day, you're a zombie. We were suggesting that he go to a pain treatment program associated with the university, let them work with him, let them try to detoxify him,  I'm fascinated, however, by the wage issue, not to lose the forest from the trees. I don't believe there's any conflict. I don't think you can explain away the employment contract. Mr. Musial can say all he wants in February that he talked about offering me this job, but that's not the reality of what transpired. He can say all he wants, they actually did hire me for CORE, but they were training me in the other and paying me under the other. They weren't paying them under CORE. I don't know how much more you would possibly need to deal with a reversal on manifest weight, but I can read two more short things from the arbitrator, who's really the commission's decision, that shows you what amount of confusion and conflict and disparity there is. He says on appendix page 16, although it is well settled that the payment of compensation is not an admission of liability, the arbitrator finds that the amount of compensation paid by the respondent can be germane to the knowledge possessed by the respondent at the time payment is made. In essence, it was the respondent, not the petitioner, who possessed the evidence which gives rise to the determination that the petitioner has an $1,125 wage when providing due regard for the wages of an employee in the same classification. Arbitrator merely adopts it. So now, basically, he's saying payment of compensation is an admission of liability to heck with any burdens of proof because Mr. Musial doesn't offer any, and then you'll have this curious statement from the arbitrator at page 6. The petitioner testified that he was hired as a sales representative and provided a written contract. This is the arbitrator. The contract is consistent with the petitioner's testimony and that it reflects that he was hired in the small business, also known as high volume division, with transfer rights to the core division. I respectfully have to say, what else do you require on this issue? I don't know why my client was paying him as if he was making $57,500, remembering this was he injured on the second day of his job. But we do have an employment contract. We do have evidence as to what he was paid while he worked, because he came back to work briefly. We understand that they sent him out to some residential place to look at an installation, not something you would do for somebody in the core. And we have Mr. Musial's own admissions. Again, assuming everything he says is true, he was disappointed that he wasn't being hired for core, but he figured what the heck, it's better than no work at all, and he admits to being hired in high volume sales. Thank you, counsel. Thank you. The court will take the matter under advisement for disposition. We'll stand in recess until 9 o'clock.